## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 09-61529-CIV-MORENO/TORRES

CATHRIN LORENTZ,

        Plaintiff,

v.

SUNSHINE HEALTH PRODUCTS,
INC., a Florida corporation, and
CATHIE RHAMES,

        Defendants.

_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS
## FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

        This matter is before the Court on the following motions:  (1) Defendants Sunshine Health Products, Inc.'s ("Sunshine") and Cathie Rhames' ("Rhames") (collectively "Defendants") Motion for Summary Judgment as to all Counts of the Amended Complaint  [D.E. 33]; (2) Plaintiff Cathrin Lorentz's ("Plaintiff") Motion for Summary Judgment on Copyright Infringement [D.E. 69]; and (3) Plaintiff's Motion to Strike Ralph Morton ("Morton") and Cathie Rhames's Declarations Submitted as Exhibits to Defendants' Motion for Partial Summary Judgment and to Show Cause as to Why Ralph Morton and Cathie Rhames Should Not Be Held in Contempt [D.E. 143].[1]  We have carefully considered these motions and the related filings as well as the record in the case, and for the following reasons recommend that (1) Defendants'

_____

[1]     The Honorable Federico A. Moreno referred all pretrial proceedings in this case to the undersigned Magistrate Judge.  [D.E. 30].

motion for summary judgment on all counts of the complaint be Granted in part and Denied in part; (2) Plaintiff's motion for summary judgment on copyright infringement be Denied; and (3) Plaintiff's motion to strike declarations be Denied.

## I.   BACKGROUND

This lawsuit concerns approximately one dozen photographs of Plaintiff that Defendants allegedly used without permission and in violation of Plaintiff's copyrights in the photographs.[2]   In her Third Amended Complaint, Plaintiff alleges one count of copyright infringement each against Sunshine (Count I) and Rhames (Count III); one count of unauthorized publication of likeness in violation of Fla. Stat. § 540.08 each against Sunshine (Count II) and Rhames (Count IV); and one count against both Defendants for injunctive relief (Count VII[3]).   [D.E. 105 (the "Complaint")].

At all times material to this case, Plaintiff was a professional model.   Sunshine is a Florida corporation that advertises and sells a teeth whitening product under the brand name "Sunshine Smiles."   Rhames is and has been at all material times Sunshine's president.   In approximately January 2003, Morton, on behalf of Sunshine, searched the internet for models to endorse Sunshine's product.   He eventually located Plaintiff and contacted her about endorsing the product.   The parties' versions of subsequent events differ markedly.

---

[2]      The number of photographs that Defendants allegedly used has increased during the course of discovery.   For example, in March 2010, Plaintiff asserted she had discovered eleven (11) different photographs of her that Defendants had used.   [D.E. 69 at 6].   In April she stated that Defendants had used thirteen (13) different images. [D.E. 77 at 3].

[3]      There are no Counts V or VI in the Third Amended Complaint.

A.    *Defendants' Version of Relevant Facts*

According to Defendants, Morton and Plaintiff discussed an arrangement whereby Plaintiff would endorse Sunshine's product and allow Sunshine to use her modeling photographs on its website.  Plaintiff told Morton she wanted more exposure to advance her modeling career and emailed photographs of herself to Morton for use on the Sunshine website.  Morton uploaded some of the photographs to the Sunshine website in approximately April 2003,[4] with Plaintiff's knowledge and consent.  Meanwhile, Plaintiff agreed to place an endorsement of Sunshine's product on her website, www.cathrinlorentz.com, which she did in April 2003.  As compensation for her endorsement, Sunshine was to provide Plaintiff with free teeth whitening products for her personal use whenever she asked for them.

The agreement between Morton and Plaintiff was the result of their email correspondence and at least one telephone conversation between January and June 2003.  Some but not all of the emails between Morton and Plaintiff have been provided to the Court and are discussed herein.  Others were lost when Sunshine's computer

---

[4]    In his June 24, 2010 declaration, Morton stated that Sunshine published the image of Plaintiff endorsing its product on its website, www.sunshineauctions.com, on May 23, 2003.  [D.E. 143 at 13 ¶ 22].  At the very least, Defendants have provided documentary evidence that images of Plaintiff appeared on www.sunshineauctions.com since at least June 3, 2003 at 12:04:17.  [D.E. 33-6 at 4-5].  We note that both parties have provided copies of various website pages that bear Plaintiff's photographs and are dated between 2003 and 2009.  These copies were preserved by an entity known as the "Internet Archive."  The Internet Archive is a website that provides access to a digital library of internet sites and other cultural artifacts in digital form.  The Internet Archive has created a service known as the "Wayback Machine" that permits a person to surf more than 150 billion pages stored in the Internet Archive's web archive.  A visitor to the Wayback Machine can type in a website address, select a date range, then surf on an archived version of the Web.  [D.E. 33-6 at 2 (Affidavit of Christopher Butler, Office Manager of the Internet Archive)].

server crashed several years ago (prior to the commencement of this lawsuit).

The first email provided to the Court is dated April 21, 2003.  It is a "mass mailing" type email that Plaintiff sent to many people, including Morton, announcing that her personal website was up and running.  [D.E. 33-1 at 8].  Morton responded on April 22, 2003 by email, the relevant portions of which are quoted here:

> I am so glad you emailed us.  Our computer crashed and we lost your email address.
>
> Any rate, attached is the picture we decided to use of yours.  We would like to send you a sample of the product so you can endorse our product with 2 or 3 sentences of praise.  In return, we will keep a link to your website for people interested in you as a model.  We need some of your special assignments [sic] you have done in the past to mention as you are our international model endorsing our product. . . .
>
> In return, we will send you product whenever you need more for your use.  If you have any new smile face shots send them to us.
>
> Make sure you email us back with your mailing address so we can send out the product to you immediately. . . .

[D.E. 33-1 at 9].

On April 28, 2003, Plaintiff responded to Morton with two email messages.  The first email mentioned that she had "put up the photo you sent me, thanks." and closed with "[h]ope to hear from you soon."  [D.E. 33-1 at 11].  The second email Plaintiff sent to Morton on April 28, 2003 contained her mailing address.  [*Id.* 33-1 at 12].  Morton thereafter had approximately four tubes of the company's teeth whitening product mailed to Plaintiff at the address she provided.  The shipment was neither rejected nor returned.

On May 31, 2003, Morton received another mass email from Plaintiff that

included a photograph from her latest job.  [D.E. 33-1 at 13].

Morton indicated that, at some point during the time Plaintiff was emailing him photographs, he asked her to send more photographs of her smiling broadly so her teeth would show more prominently.  On June 11, 2003, Plaintiff sent an email to Morton stating, "Here comes [sic] a few new photos and smily [sic] ones.  Hope you like them, speak soon. . . ."  [D.E. 33-1 at 14].  Morton responded with an email advising that they had included her link on the Sunshine website and auctions on e-Bay.  He also inquired whether she had received any modeling offers through the link to her website on the Sunshine site.

Plaintiff did not respond to Morton's last email and he did not hear from her again until Defendants were served with this lawsuit in October 2009.  Plaintiff never informed Morton that she did not want Defendants to use her photographs on Sunshine's website or to promote or endorse Defendants' products.  She never asked that Sunshine discontinue the use of her photographs on its website.  Based on their email correspondence and one telephone conversation between January and June 2003, Morton believed that Plaintiff had authorized the use of her photographs by Sunshine; knew of the use of her photograph on Sunshine's websites as early as May 2003; and agreed that the photographs she sent would be used on Sunshine's website for the endorsement of its product.

Sunshine published Plaintiff's photographs on the internet for the sale and marketing of its products, but otherwise did not use the photographs in any other manner.

Morton visited Plaintiff's website in 2003 and saw this notice:  "All photos on

this web page is Copyright © Cathrin Ms. Lorentz 2003." [D.E. 143 at 12 ¶ 14].  Based on this notice, Morton presumed that Plaintiff owned the right to authorize Sunshine to use her photographs.

### B.   *Plaintiff's Version of Relevant Facts*

According to Plaintiff, she never agreed to allow Sunshine to use her photographs.  After Morton contacted her about endorsing Sunshine's product, Plaintiff sent him the only two photographs she had of herself smiling.  However, no agreement was ever reached between herself and Defendants.  She received an email from Morton saying Sunshine would send some bleaching and teeth whitening products, an offer she laughed at because "I was making a great deal of money in my profession when I was working full time as a model.  And to have somebody offer you – I mean, would you work for somebody for seven years and be paid in teeth-whitening products?  I don't think so.  No one would.  So I laughed and never heard anything else.  That was the end of it." [D.E. 77 at 11, p. 13 lines 17-23].

Plaintiff never read the April 22, 2003 email from Morton in which he advised which photograph the Defendants had selected to use (and attached that photo to the email), nor any subsequent emails from him, until this litigation began.  With regard to the email from her to Morton dated April 28, 2003 that advised, "I put up the photo you sent me, thanks." [D.E. 77 at 25], Plaintiff did not recall sending it nor did she know who had.  Nor did she send the email dated June 11, 2003 that stated, "Here comes a few new photos and smily [sic] ones" or the photographs referenced in that email.  Further, she never had a telephone conversation with Morton about this.

Plaintiff had no knowledge or awareness that Sunshine was using her photographs in any manner until 2009. That is when she discovered, by "Googling" herself on the internet, that her images were being used by Sunshine for endorsement and advertising of its teeth whitening products on various websites. These sites included: www.brite-teeth.com; www.stores.ebay.com/teethwhiteningprostrength; www.sunshineauctions.com; www.whitersmile.com/au; and www.sunshinesmiles.com.au. In fact, Plaintiff questioned whether someone had tampered with her website as many photographs that had been posted there were discovered missing in 2009 when she "Googled" herself.

The photographs at issue in this case were taken by Peter Hall ("Hall"). Hall owned the copyrights in the images until June 6, 2009, when he signed a document that "transfer[red] to [Plaintiff] all of my rights title and interest in the copyrights of all photographs that I have created which includes her likeness prior to this date." [D.E. 69-5 at 2]. On March 13, 2010, Hall executed another transfer of copyrights "including but not limited to all rights to enforce prior infringements." [D.E. 69-5 at 4]. Defendants never communicated with Hall and never received consent from him to use his photographs of Plaintiff. On September 17, 2009, Plaintiff received certificates of registration from the United States Copyright Office for nine (9) of the photographs used by Defendants. She filed this lawsuit on September 25, 2009.

## II. ANALYSIS

The parties have filed cross-motions for summary judgment. Defendants move for summary judgment on all counts of the complaint. They argue that the statute of limitations has run on Plaintiff's claims; therefore, any claims that Plaintiff may have

had for copyright infringement (Counts I and III) and unauthorized publication of likeness (Counts II and IV) expired long before this suit was commenced. They also argue that Plaintiff's claim for injunctive relief (Count VII) is not cognizable because it cannot exist as a separate cause of action.

For her part, Plaintiff seeks entry of judgment as a matter of law on the copyright infringement claims (Counts I and III) because allegedly there is no question of fact that Defendants copied photographs of Plaintiff and placed them on multiple websites for advertising of Sunshine's products, and they did so without the permission of the copyright holder and in knowing violation of copyright law.

### A.    *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Imaging Bus. Mach., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, the Court must view all the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Id.* (citing *Cruz v. Public Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005)). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). Thus, our task is to

determine whether, considering the evidence in the light most favorable to the non-moving party, there is evidence on which the trier of fact could reasonably find a verdict in that party's favor. *See Anderson,* 477 U.S. at 251; *Hilburn,* 181 F.3d at 1225. If so, summary judgment is not appropriate.

**B.    Statute of Limitations**

Defendants argue that Plaintiff's claims for copyright infringement and unauthorized publication of likeness are barred by the federal and state statutes of limitations, respectively. Those statutes provide for a three- and four-year period of limitations, respectively. According to Defendants, Plaintiff's claims began to accrue in June 2003, hence her lawsuit, which was filed in 2009, was filed out of time.

1.    *Copyright Infringement*

A cause of action for copyright infringement must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). There is a split of authority as to when a claim "accrues" under this statute, and the Eleventh Circuit has not directly addressed this issue. *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1284-85 (M.D. Fla. 2008). The minority view and the one that Defendants urge us to follow is the "injury" rule, which holds that a claim for copyright infringement accrues when the infringing act occurs. *Id.* at 1285 (citing to *Auscape Int'l v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 235, 242-48 (S.D. N.Y. 2004) (recognizing the split of authority and concluding after analyzing the legislative history of the Copyright Act and Supreme Court precedent that the three-year limitations period begins to run from the date of infringement, not the date of discovery of the infringement)). If the injury rule were applied, Plaintiff's claims for copyright infringement would be barred because they

were filed in 2009, more than three years after the date that Defendants first used her photographs.

By contrast, the more lenient "discovery" rule provides that a copyright infringement cause of action accrues when a plaintiff "learns, or should as a reasonable person have learned, that the defendant was violating his rights." *Id.* (quoting *James W. Ross, Inc. v. Cecil Allen Constr., Inc.*, No. 6:03CV792ORL28KRS, 2004 WL 1146104, at *2 (M.D. Fla. April 26, 2004)). The discovery rule has been explicitly adopted by a majority of the Circuit Courts of Appeal as well as by the Middle District of Florida. *See, e.g., William A. Graham Co. v. Haughey*, 568 F.3d 425, 433-37 (3d Cir. 2009) (declining to follow *Auscape* and concluding instead that the text, structure, legislative history, and underlying policies of the Copyright Act favored application of the discovery rule for limitations purposes); *Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 44-45 (1st Cir. 2008); *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390-91 (6th Cir. 2007); *Polar Bear Prods, Inc. v. Timex Corp.*, 384 F.3d 700, 706-707 (9th Cir. 2004); *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004); *Lyons P'ship, L.P. v. Morris*, 243 F.3d 789, 796 (4th Cir. 2001); *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992); *Thornton*, 580 F. Supp. 2d at 1284-86 (declining to follow *Auscape* and concluding that under Eleventh Circuit law, the discovery rule should apply for statute of limitations purposes under the Copyright Act); *Tingley Sys., Inc. v. Healthlink, Inc.*, 509 F. Supp. 2d 1209, 1218 (M.D. Fla. 2007); *Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, No. 603CV1860ORL19KRS, 2005 WL 3445522, at *7 (M.D. Fla. Dec. 14, 2005).

We will follow the majority view and apply the discovery rule which we think is the better supported approach. *See* discussion in *Graham*, 568 F.3d at 433-37 and *Thornton*, 580 F. Supp. 2d at 1285-86. The question thus becomes, when did Plaintiff know, or when should she reasonably have known, of Defendants' allegedly infringing actions?

This is a hotly contested issue of material fact and goes to the heart of this litigation:  whether Plaintiff agreed to allow Defendants to use her photographs to promote their product.

Defendants contend that the unrefuted evidence demonstrates that Plaintiff knew, or had every reason to know, that Defendants were using her photographs on their website in June 2003 at the latest, and that they did so with her consent.  They point to the April 22, 2003 email in which Morton informed Plaintiff of the picture of her that Defendants decided to use; his statement that he would like to send a sample of the teeth-whitening product for her endorsement and in return, they would keep a link to her website on their website; and his request for her mailing address so he could send her the product immediately.  The photograph attached to Morton's email showed Plaintiff's image and Sunshine's name and an endorsement of its products.  On April 28, 2003, Plaintiff responded that she had posted the photograph he sent on her website.  Plaintiff's second email that same day contained her mailing address.  Then, on June 11, 2003, Plaintiff emailed Morton additional smiley photographs.  Based on this evidence, Defendants argue that Plaintiff knew of and consented to Defendants' use of her photographs in 2003.

The problem is that Plaintiff has expressly disavowed any knowledge of

Defendants' use of her photographs until 2009. She testified under oath that she did not reach an agreement with Morton for such use, nor did she provide photographs beyond the initial two smiling photographs sent in response to Morton's initial inquiry. She further testified that she did not receive the April 22nd email from Morton advising which photograph Defendants had selected, did not see the photo itself, and did not receive subsequent emails from Morton or send any to him.

We find that Plaintiff has come forward with material evidence to dispute Defendants' claim that she knew or should have known of the allegedly infringing acts in 2003. There is no written agreement between Plaintiff and Defendants regarding Defendants' use of photographs of Plaintiff. Instead, there are missing emails and a dispute about whether Plaintiff and Morton spoke over the telephone. There is only one email that referenced potential use by Defendants of a single photograph, and Plaintiff denied seeing it until after this litigation commenced. And there is a dispute about whether Plaintiff sent Morton all the photographs that Defendants used.

Thus, we cannot determine when Plaintiff first knew or should have known of Defendant's use of her photographs because it involves issues of credibility and weighing of evidence. Such questions are not the province of the Court at this stage in the proceeding. *See, e.g., Tingley*, 509 F. Supp. 2d at 1218 (issue of material fact existed as to when claims accrued given the dispute as to whether the letter that purportedly put plaintiff on notice of defendant's action was actually sent by defendant). This is a classic "he said - she said" scenario and one we cannot decide on summary judgment. We accordingly recommend that Defendants' motion for summary judgment on the copyright infringement claims (Counts I and III) be denied.

2. _Unauthorized Publication of Likeness_

Defendants argue that Plaintiff's claims for unauthorized publication of likeness brought pursuant to Fla. Stat. § 540.08[5] (Counts II and IV) are similarly barred by the statute of limitations. This statute does not have its own limitations period so claims brought under § 540.08 are governed by the four-year "catch-all" provision of Fla. Stat. § 95.11(3). _Miller v. Anheuser Busch, Inc._, 348 Fed. Appx. 547, 550 (11th Cir. 2009); _see also_ § 95.11(3)(p) (four year limitations period for any action not specifically provided for in the statute). The four-year period begins to run at the date of publication, not at discovery of publication. _Miller_, 348 Fed. Appx. at 550 (Florida applies the "single publication rule" in cases brought pursuant to § 540.08; the cause of action accrues on the date the alleged harm occurs, i.e., the date of the first unauthorized publication); _see also Putnam Berkley Group, Inc. v. Dinin_, 734 So. 2d 532, 536 (Fla. 4th DCA 1999) (holding that an action for unauthorized publication under § 540.08 must be brought within four years of the accrual of the cause of action, not four years of the discovery of the fact of publication statute); Fla. Stat. § 770.05 (a cause of action for damages founded upon a single publication accrues at the time of the first publication). Defendants assert that the limitations period has run on

---

[5]      This statute provides in relevant part that

> [n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by" that person or another authorized in writing to license the commercial use of her likeness.

Fla Stat. § 540.08(1).

Plaintiff's unauthorized publication claims as they were filed more than four years after the first date her likeness was published, in June 2003 at the latest. Under this limitations scheme, it would be irrelevant when Plaintiff first discovered that Defendants had published her images on their website.

Plaintiff counters that Florida courts have held in connection with § 540.08 that the statute of limitations period begins to run anew with each re-publication or dissemination of a photograph. She cites *Baucom v. Haverty*, 805 So. 2d 959, 960 (Fla. 2d DCA 2001), where the appellate court concluded that each time the defendants presented a potential employer with a copy of a medical report they had previously prepared while employed in connection with plaintiff's lawsuit, and that report contained confidential images of the plaintiff, the defendants were effectively re-publishing the images and starting the limitations clock anew. The court explained:

> This is not to say that a new cause of action accrued each time someone at each potential employer read or was shown the report. Rather, *a new cause of action accrued, and the statute of limitations began to run anew, the first time the report was read or shown to someone at each new potential employer.*

*Id.* at 961 (emphasis supplied) (citing § 770.05). *See also Horning-Keating v. Employers Ins. of Wausau*, 969 So. 2d 412, 418 (Fla. 5th DCA 2007) (affirming trial court's ruling that the statute of limitations had expired before plaintiff filed her claim for invasion of privacy based on a secret tape-recorded meeting, where she failed to allege that her privacy was invaded each time evidence of the taping was presented to different individuals).

We agree with Defendants that Plaintiff has failed to provide material evidence to demonstrate that Defendants listed Plaintiff's photographs in an eBay store and

that the store inventory listing was renewed every thirty days and thus re-publication occurred every thirty days. However, Plaintiff has discovered approximately 13 images of herself. She has supplied a document showing that her photograph appeared on the sunshinesmiles.com website on August 8, 2006,[6] a date within four years of Plaintiff filing this lawsuit. How and when the photographs ended up on that and other websites, and whether the photographs were re-published, are issues better left to the fact-finder. We cannot say that re-publication did *not* occur. Defendants' motion for judgment on the unauthorized publication of likeness should be denied.

    *3.*    *Injunctive Relief*

       Defendants argue that Count VII, the claim for injunctive relief, is not by itself a cognizable cause of action. Plaintiff did not respond to this argument.

       Count VII seeks as a remedy that Defendants be prohibited from further use of her photographs. [D.E. 105 at 7-8]. That would be the outcome were she to prevail on her copyright claims. As Plaintiff has not identified any reason to maintain a separate claim for injunctive relief, we recommend that Defendants' motion for summary judgment on Count VII be granted. *See, e.g., Chetu, Inc. v. Salihu*, No. 09-60588-CIV, 2009 WL 1916609, at *2 (S.D. Fla. July 3, 2009) (injunctive relief was the remedy for

---

     [6]     Defendants complain that Plaintiff has not followed the local rules in connection with the motions for summary judgment. For instance, Defendants note that Plaintiff did not file a Statement of Disputed Facts to controvert the Statement of Undisputed Facts they (Defendants) filed in support of their motion for summary judgment, as is contemplated by Local Rule 7.5. [D.E. 45 at 2-4, 9]. When a party fails to present evidence that controverts the movant's statement of facts, those facts will be deemed admitted. *See* S.D. Fla. L.R. 7.5D. Although Plaintiff did not meticulously comply with the local rules in this regard when responding to D.E. 33, she did identify evidence with citation to the record and thereby alerted the Court to facts that she contended were material and in dispute.

the plaintiff's breach of contract and statutory violation claims; plaintiff failed to identify why a separate claim for injunctive relief should be maintained and thus court dismissed it).

### C.   *Copyright Infringement*

Plaintiff moves for summary judgment on her copyright claims (Counts I and III) on the ground that Defendants placed multiple photographs of her on their website without permission from the copyright holder and in violation of copyright law.

According to Plaintiff, the photographer who took the pictures of her, Hall, owned the copyright in each of the images that Defendants used from 2003 to 2009. She asserts that she was not the copyright holder until June 2009, when Hall transferred all his rights, titles, and interests in the photographs, including the right to enforce prior infringements, to her. Plaintiff subsequently obtained copyright registrations for nine of the photographs. Defendants have acknowledged that they never sought permission from Hall to use the photos and Plaintiff maintains they never sought permission from her, either. Thus, she asserts that Defendants were not authorized to reproduce the photos, prepare derivative works, distribute copies of the photos, or display them publicly pursuant to 17 U.S.C. § 106. Moreover, she contends that Defendants' conduct was willful because they acted with actual knowledge or reckless disregard for whether they were infringing on the copyright holder's rights.

Defendants argue there is a disputed issue of material fact as to when exactly Plaintiff obtained possession of the right to sue for past copyright infringement. We agree.

Under 17 U.S.C. § 501(b), the "legal or beneficial owner of an exclusive right

under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." If Plaintiff did not have the right to sue for accrued infringements at the time she filed this action, she lacks standing to maintain this action. *See Prather v. Neva Paperbacks, Inc.* 410 F.2d 698, 700 (5th Cir. 1969).

A transfer of copyright ownership "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). However, the note or memorandum required by § 204

> *need not be contemporaneous with the transfer of copyright ownership. Rather, a memorandum executed later can serve to validate a previous oral transfer of copyright ownership. Imperial Residential Design, Inc. v. Palms Development Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995) ("We recognize that 17 U.S.C. § 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer.") (quotation omitted); 3 *Nimmer on Copyright* § 10.03 (noting that "if a prior oral grant is subsequently confirmed in writing, it validates the grant *ab initio* as of the time of the oral grant").

*Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*, No. 07-60654-CIV, 2008 WL 4938420, at *1 (S.D. Fla. Nov. 18, 2008) (emphasis supplied); *see also Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1532 (11th Cir. 1994) ("Many courts have held that the requirements of 17 U.S.C. § 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer.").

Accordingly, if Hall assigned to Plaintiff his right to sue for past infringements prior to the time she instituted this lawsuit, she has standing to pursue her copyright claims. Otherwise, these claims are barred.

Hall executed two notes that purported to transfer all his rights, title and

interest in the copyrights to Plaintiff.  The first note was executed on June 6, 2009, prior to commencement of this action.  [D.E. 69-5 at 2].  The second was executed on March 13, 2010, after commencement of the action.  [*Id.* at 4].  The second note repeated the transfer language contained in the first note with the following addition: "including but not limited to all rights to enforce prior infringements[.]".  [*Id.*]. Plaintiff says it is evident from the dates of the two transfers that Hall and Plaintiff had both an oral and written agreement to transfer all rights in the images.  She claims that the second transfer was effected simply "to assure that the transfers included any required language that had been mistakenly left out of the initial transfer." [D.E. 88 at 4-5].

We think this raises is a question of fact for the jury.  Plaintiff never testified that Hall orally assigned to her his right to sue for past infringement prior to the commencement of this lawsuit.  Moreover, neither the first or second note that Hall executed make reference to such an oral assignment.

The language employed by Hall in the first transfer, "all of my rights title and interest in the copyrights," could have been a complete assignment of every right Hall had in the copyrights, including the right to sue for past infringement. *See, e.g., SAPC, Inc. v. Lotus Dev. Corp*, 921 F.2d 360, 362-63 (1st Cir. 1990) (affirming trial court's ruling that an agreement whereby Lotus agreed to "acquire, purchase and accept from [SAPC], *all of [SAPC's] right, title and interest in* . . . all . . . copyrights . . . used by [SAPC]" unambiguously conveyed to Lotus the copyrights as well as any then-existing claims for infringement).  Whether the second note was merely a memorialization of the transfer of rights that had already been transferred is unclear.  Whether Hall and

Plaintiff had an oral agreement as to pre-existing causes of action that predated the execution of the second note is unknown.

We thus find there are fact questions that preclude summary judgment on the issue of whether Plaintiff possessed the right to sue for past infringement prior to commencement of this suit. *See, e.g., Ultra-Images, LLC v. Franclemont*, No. 05-60538-CIV, 2007 WL 4557148, at *4 (S.D. Fla. Dec. 20, 2007) (question of fact existed as to whether the April 2007 assignment was a memorialization of an earlier oral assignment of the causes of action, executed prior to the lawsuit being filed).

Defendants also argue there is an issue of fact as to whether Plaintiff had authority to authorize Defendants to use the photos.[7]   Defendants state it was unnecessary to obtain consent from Hall to use the photographs because either (1) Plaintiff owned the copyrights when she and Morton reached their agreement in 2003 or (2) represented expressly or impliedly that she owned the copyrights or had the right to authorize Defendants to use them by virtue of her having provided the photos to Defendants without informing them that she did not have any rights in them.

To counter Plaintiff's claim that she did not own the copyrights until 2009, Defendants cite her deposition testimony regarding ownership of the copyrights.  For instance, with regard to someone removing photographs from her personal website, which she discovered in 2009 after "Googling" herself, she testified, "Obviously, it's breaking the law because it's copyright to me."  [D.E. 84-3 at 13, p. 45].  She also testified that in 2003 "she knew that I had copyrights to my photos . . [and] never in

---

[7]      This of course presupposes that she did authorize such use, an issue that must be decided by the fact-finder.

a million light years thought that anyone could go in and take my stuff and then use it for this length of time." [*Id.* at 25, p. 90]. Furthermore, Defendants point to a notice that appeared on her personal website in 2003 that purports to be a copyright notice regarding the photographs on the site. Moreover, even if Plaintiff did not own the copyrights herself, Defendants suggest she could have had authority from the copyright holder to authorize Defendants' use of the photos. We find that there is an issue of fact as to whether Plaintiff owned the copyrights to her photos in 2003 or whether she held herself out as possessing authority to authorize their use.

Defendants cannot succeed on either an equitable estoppel or laches defense given the existence of disputed issues of material fact here. To prove equitable estoppel, Defendants must show that Plaintiff knew of Defendants' allegedly infringing acts in 2003. *See, e.g., Thompson v. Looney's Tavern Prods., Inc.*, 204 Fed. Appx. 844, 850 (11th Cir. 2006) (elements of estoppel in a copyright infringement action are: "(1) the party to be estopped must know the facts of the defendant's infringing conduct; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) he must rely on the plaintiff's conduct to his injury"). Similarly, to establish a laches defense, Defendants must show that Plaintiff delayed asserting her claim against them, but that obviously could occur only if Plaintiff knew of the allegedly infringing acts. *See, e.g., Ultra-Images,* 2007 WL 4557148, at *4 - *5 (to establish laches in a copyright infringement case, a defendant must show "1) a delay in asserting a right or claim, 2) that the delay was not excusable, and 3) that there was undue prejudice to the party against whom the claim is

asserted"; noting a split of authority as to whether laches was a viable defense to an infringement claim but assuming laches applied for that case).

### D.    *Plaintiff's Motion to Strike Ralph Morton's and Cathie Rhames's Declarations and for Show Cause Order*

After Defendants moved for partial summary judgment primarily on the issue of damages [D.E. 136], Plaintiff filed a motion to strike two new declarations submitted in support of Defendants' motion. [D.E. 143]. Plaintiff claims these declarations, by Ralph Morton [D.E. 136-2] and Defendant Cathie Rhames [D.E. 136-3], are sham affidavits that were offered in an attempt to controvert facts provided in Plaintiff's motion for summary judgment and other motions. Noting that both Morton and Rhames have already provided two declarations in support of Defendants' position on summary judgment, and both have been thoroughly deposed, Plaintiff asserts that the new declarations contradict prior statements without any explanation for the shifting testimony, should be deemed "sham" affidavits, and should be stricken.

We may disregard the new declarations as sham affidavits if the declarants contradicted, without explanation, their prior testimony that established there were no genuine issues of material fact. *Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768, 771 (11th Cir. 2008) (citing *Van T. Junkins & Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Junkins*, 736 F.2d at 657.

There is, however, a distinction between discrepancies that "create transparent shams" and those that "crease an issue of credibility or go to the weight of the evidence." *Croom v. Balkwill*, 672 F. Supp. 2d 1280, 1286 (M.D. Fla. 2009) (citing *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The Eleventh Circuit has explained that

> allow[ing] every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth.

*Tippens*, 805 F.2d at 953-54. Not every discrepancy in an affidavit will justify a court's decision to refuse to give credence to an affidavit. *Id.* at 954. We only disregard an affidavit if we find an "inherent inconsistency" between the affidavit and the witness's prior testimony. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (citing *Tippens*, 805 F.2d at 954)); *Lawver*, 300 Fed. Appx. at 771 (court must find that a party's affidavit and deposition contain an inherent inconsistency before it can disregard the affidavit). The rule is applied sparingly because of the harsh effect it may have on a party's case. *Rollins,* 833 F.2d at 1530.

If no inherent inconsistency exists, the general rule that an affidavit may create a genuine issue even if it conflicts with early deposition testimony governs. *Id.* (internal quotations omitted). 'Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Tippins*, 805 F.2d at 954. Issues of credibility and the weight to be given evidence are questions

of fact for the jury to resolve.  *Id.; see also Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)[8] ("In light of the jury's role in resolving questions of credibility, a district court should not reject the contents of an affidavit even if it is at odds with statements made in an earlier deposition.").  Thus, a court should not strike an affidavit if it supplements a witness's earlier testimony, presents a variation in the testimony, or represents an instance of failed memory.  *Croom*, 672 F. Supp. 2d at 1286.

We find that the statements that Plaintiff claims contradict the prior declarations and deposition testimony of Morton and Rhames do not, in fact, directly contradict their prior sworn testimony.  The more recent statements may explain or clarify prior testimony, or they may be variations on prior testimony.  But we see no inherent inconsistencies that would warrant disregarding or striking the new declarations.

One example of supposedly contradictory testimony relates to how Morton obtained the photographs of Plaintiff that Sunshine used to promote its product – whether Plaintiff emailed him each of the images used or whether Morton copied some of the images from Plaintiff's website.  In his new declaration dated June 24, 2010, Morton states that Plaintiff provided him with all the photographs used by Sunshine and that he never copied pictures from Plaintiff's website.  [D.E. 143 at 7-8 ¶¶ 39, 45-46].  Plaintiff claims the new statements contradict prior testimony given at Morton's

---

[8]      In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*, the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

January 13, 2010 deposition, when he testified that he might have taken photographs from Plaintiff's website. [D.E. 143 at 39, p. 42-43]. Plaintiff also notes that Morton's June 2010 declaration refers to emails sent to him by Plaintiff with all of the images that Defendants used, yet the emails themselves fail to exhibit any of those images. Plaintiff contends that Defendants have not explained why Morton's testimony has changed and surmises that the new, conflicting testimony has been provided simply to fashion a stronger defense to their case.

Contrary to Plaintiff's suggestion, Morton did not testify in deposition definitively about where he obtained the photographs of Plaintiff.

Q:   Is it your testimony that all ten of the photographs that you used, she sent to you?

A:   I do not recall. I don't know what was or what isn't.

* * *

Q:   Other than her sending you photographs, where else did you go to get photographs of her?

A:   I do not know, unless it was from her Web site or from her sending me pictures.

Q:   Okay. So did you access her Web site and download pictures from her Web site that she did not send to you?

A;   I don't know. I don't know what I did or didn't do. It was seven years ago. She sent me pictures, plural. That's all I can tell you.

Q:   So are you saying that your memory from seven years ago is very vague or absent?

A:   No, I'm saying that specific numbers of pictures and where they came from, I'm not 100 percent sure, so I'm not going to tell you something that I'm not 100 percent sure of, being in a deposition.

Q:   Is it possible that you went on her Web site and removed pictures

from it for use by you?

A:     Anything is possible.  Yeah, it's possible.

Q:     Is it likely that you did that?

A:     I don't know how to do that unless you copy and paste it.  That's
       what I'm having a problem with where you are going, and the
       main reason being is her Web site had a right-click and then it said
       you can't copy, to the best of my knowledge.  So that being the
       case, I don't know what I could have or couldn't have done on her
       Web site, then.

                                    * * *

Q:     That you do not remember from seven years ago whether or not
       you copied photographs from her Web site.

A:     You've mentioned ten photographs.  How many photographs she
       sent to me versus if I did anything else or got pictures from – she
       sent me different pictures.  Whether it was ten or not, is the
       direction I am going, as far as whether I copied or didn't copy it, I
       don't even see why it needed to be copied.  She sent me a lot of
       photographs.

       You are trying to establish that there was ten, and I don't
       remember if she sent me ten or eight or whatever the case
       is.

                                    * * *

Q:     Do you remember whether or not you copied photographs from her
       Web site?

A:     I do not recall whether I copied photographs from her Web site.

[D.E. 69-3 at 42-46].

       It is quite clear from the lengthy excerpt recited above that Morton never

testified that he *had* obtained photographs from Plaintiff's website.  He simply did not

remember at the time.  Thus his subsequent declaration that he "never copied or

obtained any pictures of [Plaintiff] from her web site" [D.E. 143 at 15 ¶ 39] and that

"[a]ll of the images of [Plaintiff] . . . were supplied to me in 2003 by [Plaintiff] via email" [*id.* at 16 ¶ 45] is not inherently inconsistent with his prior testimony. Variations in Morton's testimony and his failure of memory on the issue of where he obtained photographs of Plaintiff create an issue of credibility that should be decided by the trier of fact.  Disregarding or striking the June 2010 declaration is unwarranted on these facts.

We reach the same conclusion with respect to the other areas of testimony that Plaintiff claims has shifted and now contradicts prior testimony.  Morton stated in his June 2010 declaration that he did not provide Plaintiff's image to distributors or any third party. [D.E. 143 at 16 ¶ 43 and at 17 ¶ 53].  Morton did not, as Plaintiff suggests, testify in an earlier deposition (on March 12, 2010) that he "may have" provided Plaintiff's images to distributors.  Although we do not know what question was posed to Morton because Plaintiff did not supply that page from the deposition transcript, it appears from the parties' briefings that Morton was asked whether he had provided Plaintiff's images to distributors, to which he responded:  "Not that I'm aware of without actually searching through emails or whatever.  I do know in 2003, 2004 or whatever, it was probably talked about back and forth or whatever.  That's all I can say.  Not that I recall." [D.E. 143 at 43].  Morton simply could not remember.  Because he never said in deposition that he *had* provided Plaintiff's images to distributors, his later declaration that he had *not* provided images to distributors was not contradictory.

Moreover, Rhames's testimony that after the lawsuit was filed she called distributors who might have been using Plaintiff's photograph [D.E. 143 at 61-62] does not directly contradict Morton's June 2010 declaration that he did not provide

Plaintiff's images to distributors or third parties.  Defendants argue that as discovery progressed and documents were reviewed, it became clear that neither Mr. Morton nor anyone else affiliated with Defendants provided Plaintiff's images to any distributors or third parties.  This is an issue that can be explored before the finder-of-fact, whether Morton or anyone else at Sunshine did or did not provide third parties with photographs of Plaintiff.

A third area of allegedly contradictory testimony concerns Plaintiff's authorization to use her photographs.  Morton stated in his June 2010 declaration that any assertion by Plaintiff that she did not authorize the use of her photographs would be "false and erroneous based on her continuous correspondence with me . . . between January and June of 2003."  [D.E. 143 at 14 ¶ 34].  Plaintiff claims this statement contradicts Morton's "admission" during his March 12, 2010 deposition that he and Plaintiff never specifically discussed whether Defendants intended to use one or more than one of her photographs [D.E. 143 at 44]  and his "admission" that Plaintiff never sent him an email authorizing the use of more than one photograph [D.E. 143 at 45].

We find no inherent inconsistency between Morton's deposition testimony and declaration on this point.  He never said there was no agreement between Plaintiff and him regarding the use of her photographs.  Nor did he say that Plaintiff told him not to use her photographs.  This is an issue for the fact-finder.

Another line of allegedly new and conflicting testimony concerns Sunshine's sources of revenue.  In his June 2010 declaration, Morton stated that Defendants have only ever derived revenues from (1) the website "www.alibaba.com"; (2) word of mouth referrals; (3) repeat sales from existing customers; and (4) websites.  [D.E. 143 at 9-10

¶ 55]. Plaintiff complains that Morton previously failed to mention "www.alibaba.com" when asked which websites Sunshine used in relation to their products. However, the line of questioning to Morton related to websites on which Plaintiff's photographs were displayed and websites owned and operated by Defendants. [D.E. 143 at 45-47, p. 25-27]. Defendants assert that www.alibaba.com is an independent website where Defendants advertise their products, not a website owned and/or operated by Defendants. [*See* D.E. 167-2 at 3 ¶ 7].

Plaintiff further notes that "www.alibaba.com" was never identified in the financial material Defendants provided in response to Plaintiff's discovery requests for production. But Plaintiff has not pointed to any inherently inconsistent statements made by Morton. The appropriate remedy is not to strike or disregard Morton's declaration but rather to evaluate his credibility and give full or less weight to his testimony. This is an issue for the fact-finder.

Finally, Plaintiff asserts that Rhames's recent declaration revealing her knowledge of the email correspondence between Morton and Plaintiff [D.E. 143 at 30-33] contradicts her prior deposition testimony that she was not the person who received the emails or had direct contact with Plaintiff. [D.E. 143 at 56, pp. 21 and 59-60]. We find no inherent conflict between the two, as Rhames testified consistently that she had conversations with Morton about his arrangements with Plaintiff and so had limited and indirect knowledge of the communications with Plaintiff.

In conclusion, we do not find that Morton's and Rhames's recent declarations are sham affidavits that should be disregarded by the court. Any inconsistences or variations in their testimony should be resolved by the trier of fact. We therefore

recommend that Plaintiff's motion to strike these two declarations be denied.  Based on this recommendation, Plaintiff's request for an order to show cause why Morton and Rhames should not be held in contempt of court based on submission of the new declarations should likewise be denied.

Accordingly, it is hereby **RECOMMENDED** as follows:

1.    Defendants Sunshine Health Products, Inc.'s and Cathie Rhames' Motion for Summary Judgment as to all Counts of the Amended Complaint [D.E. 33] be **GRANTED in part** in that summary judgment should be granted in favor of Defendants on Count VII, the injunctive relief claim.  In all other respects Defendants' motion should be **DENIED**.

2.    Plaintiff Cathrin Lorentz's Motion for Summary Judgment on Copyright Infringement [D.E. 69] be **DENIED**;

3.    Plaintiff's Motion to Strike Ralph Morton and Cathie Rhames's Declarations Submitted as Exhibits to Defendants' Motion for Partial Summary Judgment and to Show Cause as to Why Ralph Morton and Cathie Rhames Should Not Be Held in Contempt [D.E. 143] be **DENIED**.

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 27th day of August, 2010.

          /s/   *Edwin G. Torres*
          EDWIN G. TORRES
          United States Magistrate Judge