## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 09-61529-CIV-MORENO/TORRES

CATHRIN LORENTZ,

      Plaintiff,

v.

SUNSHINE HEALTH PRODUCTS,
INC., a Florida corporation, and
CATHIE RHAMES,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON MOTION
## FOR SUMMARY JUDGMENT AND RELATED MOTION *IN LIMINE*

This matter is before the Court on Defendants' Motion for Partial Summary Judgment as to (1) Copyright Infringement Damages, (2) Punitive Damages, (3) Statutory Damages, and (4) Attorney's Fees and Statutory Presumption of Copyright Validity [D.E. 136] as well as Defendants' related Motion *In Limine* [D.E. 146]. We have carefully considered the motion and the related filings as well as the record in the case, and for the following reasons recommend that Defendants' motion for summary judgment be Granted in part and Denied in part while the motion *in limine* be Denied.

### I.    BACKGROUND

This lawsuit concerns approximately one dozen photographs of Plaintiff that Defendants allegedly used without permission and in violation of Plaintiff's copyrights in the photographs.  In her Third Amended Complaint, Plaintiff alleges one count of

copyright infringement each against Sunshine (Count I) and Rhames (Count III); one count of unauthorized publication of likeness in violation of Fla. Stat. § 540.08 each against Sunshine (Count II) and Rhames (Count IV); and one count against both Defendants for injunctive relief (Count VII). [D.E. 105 (the "Complaint")[1]].

At all times material to this case, Plaintiff was a professional model. Sunshine is a Florida corporation that advertises and sells a teeth whitening product under the brand name "Sunshine Smiles." Rhames is and has been at all material times Sunshine's president. In approximately January 2003, Ralph Morton ("Morton"), on behalf of Sunshine, searched the internet for models to endorse Sunshine's product. He eventually located Plaintiff and contacted her about endorsing the product. The parties' versions of subsequent events differ markedly.[2]

### A.   *Defendants' Version of Relevant Facts*

According to Defendants, Morton and Plaintiff discussed an arrangement whereby Plaintiff would endorse Sunshine's product and allow Sunshine to use her modeling photographs on its website. Plaintiff told Morton she wanted more exposure to advance her modeling career and emailed photographs of herself to Morton for use on the Sunshine website. Morton uploaded some of the photographs to the Sunshine website in approximately April 2003, with Plaintiff's knowledge and consent. Meanwhile, Plaintiff agreed to place an endorsement of Sunshine's product on her

---

[1]      There are no Counts V or VI in the Third Amended Complaint.

[2]      We recently issued a Report and Recommendation recommending that the parties' cross-motions for summary judgment be denied in large part because of the many material factual disputes.

website, www.cathrinlorentz.com, which she did in April 2003.  As compensation for

her endorsement, Sunshine was to provide Plaintiff with free teeth whitening products

for her personal use whenever she asked for them.

The agreement between Morton and Plaintiff was the result of their email

correspondence and at least one telephone conversation between January and June

2003.  Some but not all of the emails between Morton and Plaintiff have been provided

to the Court and are discussed herein.  Others were lost when Sunshine's computer

server crashed several years ago (prior to the commencement of this lawsuit).

The first email provided to the Court is dated April 21, 2003.  It is a "mass

mailing" type email that Plaintiff sent to many people, including Morton, announcing

that her personal website was up and running.  [D.E. 33-1 at 8].  Morton responded on

April 22, 2003 by email, the relevant portions of which are quoted here:

> I am so glad you emailed us.  Our computer crashed and we lost your
> email address.
>
> Any rate, attached is the picture we decided to use of yours.  We would
> like to send you a sample of the product so you can endorse our product
> with 2 or 3 sentences of praise.  In return, we will keep a link to your
> website for people interested in you as a model.  We need some of your
> special assignments [sic] you have done in the past to mention as you are
> our international model endorsing our product. . . .
>
> In return, we will send you product whenever you need more for your use.
> If you have any new smile face shots send them to us.
>
> Make sure you email us back with your mailing address so we can send
> out the product to you immediately. . . .

[D.E. 33-1 at 9].

On April 28, 2003, Plaintiff responded to Morton with two email messages.  The

first email mentioned that she had "put up the photo you sent me, thanks." and closed

with "[h]ope to hear from you soon." [D.E. 33-1 at 11].  The second email Plaintiff sent to Morton on April 28, 2003 contained her mailing address.  [*Id.* 33-1 at 12].  Morton thereafter had approximately four tubes of the company's teeth whitening product mailed to Plaintiff at the address she provided.  The shipment was neither rejected nor returned.

On May 31, 2003, Morton received another mass email from Plaintiff that included a photograph from her latest job.  [D.E. 33-1 at 13].

Morton indicated that at some point during the time Plaintiff was emailing him photographs, he asked her to send more photographs of her smiling broadly so her teeth would show more prominently.  On June 11, 2003, Plaintiff sent an email to Morton stating, "Here comes [sic] a few new photos and smily [sic] ones.  Hope you like them, speak soon. . . ."  [D.E. 33-1 at 14].  Morton responded with an email advising that they had included her link on the Sunshine website and auctions on e-Bay.  He also inquired whether she had received any modeling offers through the link to her website on the Sunshine site.

Plaintiff did not respond to Morton's last email and he did not hear from her again until Defendants were served with this lawsuit in October 2009.  Plaintiff never informed Morton that she did not want Defendants to use her photographs on Sunshine's website or to promote or endorse Defendants' products.  She never asked that Sunshine discontinue the use of her photographs on its website.  Based on their email correspondence and one telephone conversation between January and June 2003, Morton believed that Plaintiff had authorized the use of her photographs by Sunshine;

knew of the use of her photograph on Sunshine's websites as early as May 2003; and agreed that the photographs she sent would be used on Sunshine's website for the endorsement of its product.

Sunshine published Plaintiff's photographs on the internet for the sale and marketing of its products, but otherwise did not use the photographs in any other manner.   For instance, Defendants never provided Plaintiff's photographs to distributors of teeth whitening products or, for that matter, to any third party.   The only websites that Defendants ever advertised products for sale on and on which Plaintiff's photographs were displayed were three of Sunshine's websites: www.sunshineauctions.com, www.brite-teeth.com, and http://stores.ebay.com/TEETHWHITENING-ProStrength.   Plaintiff's photographs appeared on www.sunshineauctions.com and the ebay site from April 2003 through the time the complaint was filed.   Her photographs appeared on the www.brite-teethc.om from April 2003 through approximately May 2004.   Defendants do not own, control, or have any association with the websites www.whitersmile.com/au or www.sunshinesmiles.com/au and never authorized the operators of those sites to use Plaintiff's photographs.

Defendants have only derived revenues from (1) the website www.alibaba.com; (2) word of mouth referrals; (3) repeat sales from existing customers; and (4) sales from the aforementioned three Sunshine websites. The vast majority of their revenues came from the first three sources.  For instance, Morton testified that "the escalation of the gross revenues that you see . . . for 2007 through 2009 are directly related and correlate with the introduction of us going on [www.alibaba.com]." [D.E. 180-4 at 3, p. 67].

Morton visited Plaintiff's website in 2003 and saw this notice: "All photos on this web page is Copyright © Cathrin Ms. Lorentz 2003." [D.E. 143 at 12 ¶ 14]. Based on this notice, Morton presumed that Plaintiff owned the right to authorize Sunshine to use her photographs.

### B.     *Plaintiff's Version of Relevant Facts*

According to Plaintiff, she never agreed to allow Sunshine to use her photographs. After Morton contacted her about endorsing Sunshine's product, Plaintiff sent him the only two photographs she had of herself smiling. However, no agreement was ever reached between herself and Defendants. She received an email from Morton saying Sunshine would send some bleaching and teeth whitening products, an offer she laughed at because "I was making a great deal of money in my profession when I was working full time as a model. And to have somebody offer you – I mean, would you work for somebody for seven years and be paid in teeth-whitening products? I don't think so. No one would. So I laughed and never heard anything else. That was the end of it." [D.E. 77 at 11, p. 13 lines 17-23].

Plaintiff never read the April 22, 2003 email from Morton in which he advised which photograph the Defendants had selected to use (and attached that photo to the email), nor any subsequent emails from him, until this litigation began. With regard to the email from her to Morton dated April 28, 2003 that advised, "I put up the photo you sent me, thanks." [D.E. 77 at 25], Plaintiff did not recall sending it nor did she know who had. Nor did she send the email dated June 11, 2003 that stated, "Here comes a few new photos and smily [sic] ones" or the photographs referenced in that

email.  Further, she never had a telephone conversation with Morton about this.

Plaintiff had no knowledge or awareness that Sunshine was using her photographs in any manner until 2009.  That is when she discovered, by "Googling" herself on the internet, that her images were being used by Sunshine for endorsement and advertising of its teeth whitening products on various websites.  These sites included:   www.brite-teeth.com;   http://stores.ebay.com/TEETH-WHITENING-ProStrength;   www.sunshineauctions.com;   www.whitersmile.com/au;   and www.sunshinesmiles.com.au.  Plaintiff's photographs appeared on the www.brite-teeth.com site from April 2003 to May of 2004 and again from December 2005 to February 2006.  Plaintiff disputes that Defendants' revenues came from sources other than their websites, such as www.alibaba.com.

The photographs at issue in this case were taken by Peter Hall ("Hall").  Hall owned the copyrights in the images until June 6, 2009, when he signed a document that "transfer[red] to [Plaintiff] all of my rights title and interest in the copyrights of all photographs that I have created which includes her likeness prior to this date." [D.E. 69-5 at 2].  On March 13, 2010, Hall executed another transfer of copyrights "including but not limited to all rights to enforce prior infringements." [D.E. 69-5 at 4].  Defendants never communicated with Hall and never received consent from him to use his photographs of Plaintiff.  On September 17, 2009, Plaintiff received certificates of registration from the United States Copyright Office for nine (9) of the photographs used by Defendants.  She filed this lawsuit on September 25, 2009.

## II.   ANALYSIS

Defendants move for partial summary judgment on the issue of damages.  They

argue first that Plaintiff has not demonstrated her entitlement to either actual damages or Defendants' profits under the Copyright Act. They further contend that the evidence of record does not justify the imposition of punitive damages. In addition, Defendants argue and Plaintiff concedes that she is not entitled to statutory damages or attorneys' fees. Defendants also argue and Plaintiff acknowledges that her copyright registrations are not entitled to the presumption of validity embodied in 17 U.S.C. § 410(c). We also discuss Defendants' motion *in limine* as it relates to the expert reports.

###### A.     *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Imaging Bus. Machs., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, the Court must view all the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Id.* (citing *Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005)). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). Thus, our task is to determine whether, considering the evidence in the light most favorable to the non-

moving party, there is evidence from which the trier of fact could reasonably find a verdict in that party's favor.  *See Anderson,* 477 U.S. at 251; *Hilburn*, 181 F.3d at 1225. If so, summary judgment is not appropriate.

### B.     *Actual Damages and Defendants' Profits*

Defendants argue that Plaintiff has failed to produce any evidence that she is entitled to either actual damages or profits from Defendants under the Copyright Act. A copyright owner who successfully proves infringement could be entitled to both:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

### 1.     *Actual Damages*

Plaintiff claims that she lost, as result of Defendants' allegedly infringing conduct, modeling fees as well as revenues for the use of her photographs.  To recover actual damages, she must demonstrate a "causal connection" between Defendants' infringement and an injury to the market value of the copyrighted photographs at the time of the infringement.  *Montgomery v. Noga*, 168 F.3d 1282, 1294 (11th Cir. 1999). Actual damages are often measured by the revenue that a plaintiff lost as a result of the infringement, *id.* at 1295 n.19, which includes "lost sales, lost opportunities to license, or diminution in the value of the copyright."  *Thornton J Jargon Co.*, 580 F. Supp. 2d 1261, 1276 (M.D. Fla. 2008) (citing *On Davis v. The Gap, Inc.*, 246 F.3d 152,

164 (2d Cir. 2001)).

Defendants contend that Plaintiff has failed to produce evidence demonstrating that she lost any revenue as a result of Defendants' actions. They argue that she did not present evidence that she earned any revenue from the photographs at issue, that those photographs had any market value, or that the use by Defendants of those photographs had any negative impact on her. Defendants are not asserting that Plaintiff must demonstrate the *amount* of her actual damages at this point but, rather, that she must show, at a minimum, that a casual connection exists between infringing conduct and lost revenues. [D.E. 180 at 11].

With regard to modeling fees, Plaintiff testified that she would have been paid 100,000 (British) pounds per year for a campaign of the type undertaken by Defendants, had she done the job. [D.E. 180-1 at 18, p. 239]. Although Plaintiff could not say with certainty that she lost other work as a model as a result of the Defendants' use of her photographs, she testified that it was not normal in the modeling industry to "tie yourself up for more than a year, maximum three, because it's overexposure of you as a working model[,]" and therefore there probably would have been some damage to her employability. [D.E. 180-1 at 34-35, pp. 255-56].

This testimony is corroborated by the expert report of Peggi McKinley,[3] who

_____

[3]    Defendants argue that McKinley's report, as well as the expert reports of Plaintiff's other experts, are unsworn and lack evidentiary support, and therefore cannot create genuine issues for trial. [D.E. 180 at 11-14]. A party opposing summary judgment must come forward with sworn evidence in the form of an affidavit or deposition to support her theory of a claim, and expert testimony must be factually supported. While the expert reports that Plaintiff submitted do not meet these requirements, we look to them to corroborate other evidence Plaintiff has presented. We note that at the time Plaintiff filed her response to Defendants' motion for

opined that a standard modeling fee in 2003 for a campaign of the sort Defendants employed would have been approximately $75,000.00 for the first year usage worldwide in all media; if an agreement were made at the onset for usage for subsequent years (which was typical), the second year would be $100,000.00; third year would be $150,000.00; fourth year $200,000.00; fifth year $250,000; sixth year $300,000; and seventh year $350,000.  [D.E. 152-10 at 39 (Expert Report of Peggi McKinley), p. 2].  However, McKinley opined that modeling campaigns lasting beyond three years were unusual as it was damaging to the model's career to enter into such a long campaign.  [*Id.*].  The expert further opined that Plaintiff "would definitely experience a decrease in her marketability as a model and a decrease in the market value of the images in question at this point in time, as a result of this seven year ad campaign."

We find this evidence sufficiently shows a causal connection between Defendants' use of Plaintiff's photographs and her lost profits in the form of modeling fees that she would have earned had she and Defendants contracted for this job.

Plaintiff may also claim a reasonable, retroactive licensing fee as part of her actual damages.  Courts and commentators generally agree that § 504(b) "should be broadly construed to favor victims of infringement."  *Hofmann v. O'Brien*, 367 Fed. Appx. 439, 442 (4th Cir. 2010) (quoting *On Davis*, 246 F.3d at 164)).  "Where a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, the owner has suffered damages to

_____

summary judgment, expert discovery had not closed.

the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for." *Id.* (quoting *On Davis*, 246 F.3d at 165) (internal quotation marks omitted).  Thus, the copyright owner may recover the fair market value of the licensing fee that would have been charged for the work that was infringed.  *Id.*; *see also Thornton*, 580 F. Supp. 2d at 1276 ("[A] claim for lost profits may include a retroactive license fee measured by what the plaintiff would have earned by licensing the infringing use to the defendant."); *On Davis*, 246 F.3d at 166 ("we can see little reason not to consider the uncollected license fee as an element of actual damages under § 504(b)."); *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 357-58 (S.D. N.Y. 2003) (following *On Davis* and concluding that a reasonable licensing fee can fall within an actual damages calculation).

To demonstrate entitlement to a reasonable licensing fee, Plaintiff must show her photographs had a fair market value.  *Thornton*, 580 F. Supp. 2d at 1276.  She can make this showing by demonstrating that she "previously received compensation for use of the infringed work" or by providing evidence of "benchmark licenses, that is, what licensors have paid for use of similar work."  *Id.  See also On Davis*, 246 F.3d at 166 (the plaintiff testified that he had previously received a certain amount for the use of a photograph which included his copyrighted eyewear); *Baker*, 254 F. Supp. 2d at 359 (plaintiff produced evidence of previous license fees paid for the publication of his photographs); *Country Road Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 331-32 (S.D. N.Y. 2003) (license fees paid to other artists could be used to measure the plaintiff's license fee).

Plaintiff has not provided specific evidence of past licensing fees for the particular photographs at issue here.  However, she testified that some of the photos had been published in the past [*see, e.g.,* D.E. 152-1 at 26, pp. 190-91] and that her former modeling agent (whom had yet to be deposed at the time Plaintiff submitted this response) had those figures [D.E. 180-1 at 19, pp. 240-41].  However, she has provided evidence of benchmark licensing fees for the photographs.  Her expert, Lee Gordon, examined the photographs that Defendants used and offered a "stock photograph copyright licensing quote" for each, for total licensing fees in the amount of $275,025.36.  [D.E. 152-10 at 20-29 (Expert Report of Lee Gordon)].  Gordon also opined that Defendants' use of Plaintiff's photographs "has virtually eliminated any future value or potential third party licensing sales" for her.  [*Id.* at 6, p. 1].  Once the infringement occurred, he stated, "there was a significant injury to the potential market value of [twelve photographs] for any interested third party licensing usage." [*Id.* at 7, p. 2].  He also opined that the use by Defendants' "considerably diminished market value and loss of potential sales" for Plaintiff.  [*Id.* at 7, p. 2].

We find that Plaintiff's testimony and supporting corroboration create a triable issue as to a reasonable, retroactive licensing fee for these photographs, in addition to the amount of modeling fees she lost as a result of Defendants' actions.  Whether Plaintiff can sustain her burden of proof at trial is another matter and not ours to decide.

### 2.    *Defendants' Profits*

Defendants also argue that Plaintiff is not entitled to recover Defendants' profits because she has failed to demonstrate a causal connection between the infringement

and their profits.  As previously noted, the Copyright Act permits a copyright owner

to recover "any profits of the infringer that are attributable to the infringement."  To

establish a defendant's profits, the copyright owner must

> present proof only of the infringer's gross revenue, and the infringer is
> required to prove his or her deductible expenses and the elements of
> profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).  This provision creates an initial presumption that the infringer's

profits attributable to the infringement are equal to the infringer's gross revenue.

*Bouchat v. Baltimore Ravens Football* Club, Inc., 346 F.3d 514, 520 (4th Cir. 2003)

(citation omitted).  Once the copyright owner has presented evidence of the gross

revenue of the infringer, the burden shifts to the infringer to show either that part or

all of the revenue is not profit, or that it is "attributable to factors other than the

copyrighted work." *Id.*  The infringer has the burden of showing that certain portions

of its revenue was due to factors other than the infringement but need not prove these

amounts with mathematical precision.  *Id.*

Although the plain language of § 504(b) does not expressly require a copyright

owner to show a nexus between a defendant's gross revenues and the infringement,

and the Eleventh Circuit Court of Appeals has not ruled directly on this issue, most of

the other circuit courts of appeal and our own district court have required some nexus

between the infringing activity and the gross revenue figure proffered by a copyright

owner.  *See, e.g., Ordonez-Dawes v. Turnkey Props., Inc.*, No. 06-60557-CIV, 2008 WL

828124, at *3 (S.D. Fla. March 27, 2008) (citing to decisions from the Second, Fourth,

Seventh, Eighth, Ninth, and Federal Circuits that required a nexus between the gross

revenue and infringement); *Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp.

2d 1148, 1175 (S.D. Fla. 2006) (a plaintiff must proffer some reasonable connection between the infringement and defendant's gross revenue); *Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, No. 603CV1860ORL19KRS, 2005 WL 3445522, at *14 (M.D. Fla. Dec. 14, 2005) (Fawsett, Chief J.) (holding that the plaintiff "is required to at least proffer some evidence of a causal connection between the alleged infringement of the plans at issue and the home construction profits earned by [the defendant] in order to survive summary judgment."; rejecting plaintiff's argument that merely proving the defendant's gross revenue was sufficient); *On Davis*, 246 F.3d at 160 ("Nonetheless we think the term "gross revenue" under the statute means gross revenue reasonably related to the infringement, not unrelated revenues."); *but see Home Design Servs., Inc. v. Park Square Enters., Inc.*, No. 6:02-cv-637-Orl-28JGG, 2005 U.S. Dist. Lexis 33627, at *11 (M.D. Fla. May 2, 2005) (Antoon, J.) ("Notwithstanding the plain language of Section 504(b), Defendants maintain that, to survive summary judgment, Home Design must proffer 'non-speculative evidence' which supports a causal link between Defendants' profits and [] their alleged infringing activities. As there is no basis here to depart from the plain language of a statute, Defendants' argument fails."). We agree with the majority of courts and hold that Plaintiff must proffer *some* nexus between infringement and revenue. We find that she has.

Plaintiff claims that all of Defendants' gross revenue was derived through the sale of its products on its websites, where Plaintiff's images were used to endorse and advertise those products. [D.E. 152 at 14-15]. Defendants dispute this assertion, arguing that the evidence shows that the vast majority of their revenue was derived not through their websites but through sales channels that never had any connection

to Plaintiff's images.  [D.E. 180 at 17].  Defendants contend that Plaintiff has failed to establish which portion of their profits is specifically attributable to their use of Plaintiff's images and, therefore, she cannot establish any causal connection between revenues and the infringement.

We agree with Defendants that Plaintiff is not entitled to recover profits that are not attributable to Defendants' infringing activity.  However, it is clear that *some* portion of Defendants' profits over the relevant time period derived from their alleged mis-use of Plaintiff's photographs.

At least for some period of time between 2003 and 2009, all of the sales for Defendants' products were conducted online. Rhames testified that "[i]n the beginning all of our sales were done online to the best of my knowledge."  [D.E. 152-7 at 7, p. 12]. All profits derived from these sales would have been causally connected to Defendants' use of Plaintiff's images.

Additionally, there is no dispute that one or more of Plaintiff's images appeared on the SunshineAuctions.com, brite-teeth.com, and ebay websites to endorse and advertise their products.  [D.E. 152-5 at 11, pp. 25-27; D.E. 152-6 at 10, pp. 25-27].  A look at the archived webpages reveals that Plaintiff's photographs featured quite prominently in the advertisements for Defendants' teeth whitening product.  On some of the pages, a compilation of nine or eleven different images of Plaintiff was displayed. [*See, e.g.,* D.E. 152-4 at 2 (eleven images on brite-teeth.com; *id.* at 34 (nine images on an ebay site); *id.* at 53 (one image on sunshineauctions.com)].[4]  They were an integral

---

[4]     Plaintiff intends to offer a marketing expert, Paul W. Miniard, to demonstrate the connection between Defendants' use of Plaintiff's image in advertising

part of the ads.

Plaintiff's photographs appeared on www.sunshineauctions.com and the ebay site from April 2003 through the time the complaint in this case was filed. Sunshine Auctions was a website only, i.e., all sales for its sole product (teeth whitening products) were sold exclusively through the website. [D.E. 152-6 at 16, p. 51]. Sunshineauctions.com was terminated just this year while the Sunshine Auctions site on ebay continues to exist. [D.E. 152-6 at 5, pp. 4-5].

Defendants indicated that the ebay store was supported by them through at least 2005 or 2006, when they phased it out. [D.E. 152-5 at 11, pp. 25-27]. Plaintiff's photographs also appeared on the www.brite-teethc.com from April 2003 through at least May 2004, although Plaintiff claims her images also appeared on that site from December 2005 through February 2006.

Plaintiff also argues that circumstantial evidence can support a finding of a nexus between Defendants' revenue and the use of her photos. She cites *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789 (8th Cir. 2003), a case in which the Eighth Circuit determined that the jury had enough circumstantial evidence to find that a commercial that included the plaintiff's copyrighted work contributed to the defendant

_____

the product and the sales generated from that advertising. In his expert report, Miniard concluded that "it is not a leap of faith to suggest that the effects" of using Plaintiff's images and endorsement "would have resulted in more favorable purchase intentions [of consumers] and product sales." [D.E. 152-10 at 61]. Additionally, another of Plaintiff's experts, Gordon, opined that Defendants' incorporation of Plaintiff's images into their website advertising "appreciatively increased the dynamic impact of their website advertising . . . [which] added significant advertising value and benefits to this teeth-whitening product line." [D.E. 152-10 at 7]. These experts may lend support to Plaintiff's contention that there is a nexus between the infringement and Defendants' revenue.

Audi's profitable introduction of its new coupe.  The court considered several factors, including that the plaintiff's copyrighted work was at the centerpiece of Audi's television commercial for the new coupe; Audi enthusiastically presented the commercial to its dealers as important and integral to its launch of the coupe; and Audi's sales of the coupe when the commercial was airing were above projections.  *Id.* at 797.  The court noted that although the commercial probably did not contribute to every purchase of the new coupe, once plaintiff had shown a nexus between the infringement and revenues, the plaintiff had only to establish Audi's gross revenues from the new model, then the burden shifted to Audi to show what effect other factors had on its profits.  *Id.*

Plaintiff points to the following as circumstantial evidence of a causal connection between the unauthorized use of her photos and Defendants' profits:  Rhames' deposition testimony that her partner Morton was excited over the use of Plaintiff's images and that Morton thought using the images would lead to increased revenues. [D.E. 152 at 16].  Plaintiff also points out that her images were used as a "centerpiece of Defendants' endorsement of their products."  [*Id*].

We will not rely on the hearsay statements of what Morton purportedly told Rhames.  However, we do agree that the compilations of up to eleven of Plaintiff's photographs that were prominently displayed on Defendants' websites and were a focal point of Defendants' ads are circumstantial evidence of a nexus between infringement and revenue.

While Defendant claims that the increased revenue that followed use of Plaintiff's images was unrelated to those images, Plaintiff has proffered enough

evidence that, construed in a light most favorable to her together with all reasonable inferences, allows us to find a causal connection between Defendants' use of Plaintiff's photographs and their profits and a question of fact as to how much of the revenues were attributable to the infringement.   The burden now shifts to Defendants to establish the revenue came from non-infringing activity.   Accordingly, we recommend that Defendants' motion for summary judgment on Plaintiff's claim for Defendants' profits attributable to the infringement be denied.

### C.   *Punitive Damages*

Defendants also contend that Plaintiff is not entitled to punitive damages if she prevails on her unauthorized publication of likeness claims.   Defendants state that, once they learned of her objection to the use of her photographs, they immediately took measures to remove all of her photos from their websites of which they were aware. When additional sites that contained Plaintiff's images were discovered during discovery, the offending photographs were quickly removed from those sites, too. Defendants contend they used her photos based on a good-faith belief that they had an agreement with her to do so.   But even if they were mistaken, they say there is no evidence in this record of any intent to harm Plaintiff.

A party prevailing on an unauthorized publication of likeness claim brought pursuant to Fla. Stat. § 540.08 may recover damages, including punitive damages.   § 540.08(2).   As § 540.08 does not provide a standard for determining when punitive damages are appropriate, we look to Florida's punitive damages statute, Fla. Stat. § 768.72, for guidance.   *See WFTV, Inc. v. Hinn*, 705 So. 2d 1010, 1011 (Fla. 5th DCA 1998) (§ 540.08(2), which does not provide any procedure by which a claim for punitive

damages should be pled, should be read in conjunction with § 768.72).[5]

We find two Florida cases that reach opposite results on this issue particularly instructive.

In the first, *Genesis Publ'ns, Inc. v. Goss*, 437 So. 2d 169 (Fla. 3d DCA 1983), the court found punitive damages were not warranted.  There, a magazine company obtained a nude photograph of the plaintiff from an advertising agency, then published the photograph in an advertisement without obtaining the plaintiff's permission. *Id.* at 169.  Although permission to publish the photograph was required by law (including § 540.08), a corporate officer for the defendant company testified that notwithstanding the requirements of law, the company never sought permission because it was assumed that the advertising agency would obtain the necessary permission in accordance with the industry practice.  *Id.* at 170.

The court reviewed the standard for imposition of punitive damages:

If there [is] evidence tending to show intentional, wanton and malicious

_____

[5]    Under § 768.72, punitive damages may be imposed "only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." § 768.72(2).  These two terms are defined as follows:

(a)   "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

(b) "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

Fla. Stat. §§ 768.72(2)(a)-(b).

> disregard for laws designed to protect people's rights, the issue of punitive damages would properly be one for the jury.  However, plaintiff must show more than an intent to commit a tort or violate a statute to justify punitive damages. . . .  "[M]ere proof of an intentional tort does not *ipso facto* entitle the plaintiff to punitive damages. . . ."

*Id.* (internal citation omitted).  Applying this standard, the court determined that the defendant's conduct was intentional, but not a wanton disregard of plaintiff's rights. *Id.*  "The terms 'recklessness, wantonness and willfulness,' when used to justify punitive damages impl[y] a knowledge and present consciousness not simply that a statute or right will be violated but that injury will result." *Id.* at 170-71.  Punitive damages were therefore inappropriate under the facts of the case, the *Genesis* court concluded. *Id.* at 171.

On the other hand, an award of punitive damages was affirmed in *Sun Int'l Bahamas, Ltd. v. Wagner*, 758 So. 2d 1190 (Fla. 3d DCA 2000).  In *Sun*, the plaintiff participated in a 1990 photo shoot after being hired by an advertising agency to model for brochures and other public relations materials for the defendant resort. *Id.* at 1191.  The plaintiff signed a contract giving the defendant unlimited rights to his photographs for three years (or until 1993). *Id.*  In 1994, however, the resort used the plaintiff's photographs without contacting him about an extension of the contract or compensating him for the continued use of his pictures. *Id.*  Meanwhile, during the same time period, the defendant contacted other models involved in the 1990 photo shoot and compensated *them* for the continued use of *their* photos. *Id.*  The defendant became aware that authorization to use the plaintiff's photographs had expired but refused to compensate him for the use of his photos during the unauthorized period.

*Id.*

On appeal, the court affirmed the award of punitive damages because, unlike in *Genesis*, it found that the defendant "had direct knowledge in 1994 that it had no permission to use [the plaintiff's] photographs. Yet, despite [the defendant's] direct knowledge, as late as 1995, copies of the old brochures containing [the plaintiff's] photographs were found in travel agencies and at the resort itself." *Id.*

We turn now to the facts in our case. Construing the evidence in this record in a light most favorable to Plaintiff as the non-moving party, we find there is evidence which, if believed by the fact-finder, could support an award of punitive damages against Defendants.

The jury could find that Defendants knew that Plaintiff had rejected Morton's overtures and had not granted permission for them to use her photographs to advertise and promote their product, yet they did so anyway. Although Plaintiff emailed Morton two photographs of herself after he initially contacted her, she never sent any additional photos. Morton took the other photographs that Defendants eventually used from Plaintiff's personal website, without permission. He knew Plaintiff was a professional model whose photographs were copyrighted and was fully aware of the need to obtain authorization before using copyrighted photographs. Nonetheless, without obtaining permission, Defendants used at least thirteen different photographs of Plaintiff to promote their product. They did so for over six years until Plaintiff discovered the unauthorized use and commenced this lawsuit against them. Not once after the initial contacts with Plaintiff in 2003 did Defendants ever communicate with her nor did they compensate her in any way for the use of her photographs.

This evidence – which we reiterate is hotly disputed – rises to the level of a conscious and wanton disregard for Plaintiff's rights with knowledge that injury would result.  It shows more than just an intentional act of using photographs without permission.  It shows that Defendants used copyrighted photographs even though permission to do so was denied, and they did so surreptitiously for over six years until they were caught, and without once compensating Plaintiff for the use.  We think this type of evidence, if believed, rises to the level of "truly culpable behavior" necessary for imposition of punitive damages.

These facts distinguish our case from *Weinstein Design Group, Inc. v. Fielder*, 884 So. 2d 990 (Fla. 4th DCA 2004), a case that Defendants rely on.  The defendant in *Weinstein* used the plaintiff's name for advertising purposes for approximately two years, without obtaining consent to do so even though he knew that consent was required.  *Id.* at 999.  By way of explanation, the defendant testified that he had received permission to use the plaintiff's name from his (the plaintiff's) wife, which she denied doing.  *Id.*  The court found "no evidence of intentional, malicious misconduct, undertaken with knowledge that injury to [the plaintiff] would result."  *Id.* at 1001.  The court noted especially the fact that the defendant thought he had permission from the plaintiff's wife and that association with the defendant's firm would benefit the plaintiff.  *Id.*

In our case, however, if we construe the evidence and inferences in the non-movant's favor, Defendants were not simply mistaken about whether there was an agreement with Plaintiff regarding the use of her photographs; instead, *they knew they had asked for but not obtained permission* yet they proceeded to use her photographs

for over six years to their benefit and her detriment.  This type of evidence, if believed by the fact-finder, goes beyond an intentional act and shows a willful and wanton disregard of Plaintiff's rights, and thus meets the high standards for imposition of punitive damages.  Because the underlying facts are in dispute, we recommend denial of Defendants' motion for summary judgment on the issue of punitive damages.

### D.   *Statutory Damages and Attorneys' Fees*

Plaintiff concedes that she is not entitled to statutory damages or attorneys' fees under the Copyright Act.  [D.E. 152 at 27].  Accordingly, we recommend granting summary judgment as to Counts I and III of the Third Amended Complaint such that Plaintiff is precluded from seeking statutory damages or attorneys' fees should she prevail on those counts.

### E.   *Presumption of Validity*

Plaintiff implicitly acknowledges that she is not entitled to a "presumption of validity" because registration of the photographs was not obtained within five (5) years of the first publication of the photographs, as required by 17 U.S.C. § 410(c).  She suggests, however, that the Court can accord evidentiary weight to the certificates of registration as evidence that she owns valid copyrights.  She states that Defendants have presented neither evidence nor argument as to why the certificates should not be considered evidence of valid copyrights, or why the copyrights would be invalid, or that she is not the owner of the copyrights.  That may be so, but it does not prevent us from recommending that Defendants' specific request on this issue be granted:  that no presumption of validity should attach to Plaintiff's copyright registrations for the photographs at issue here under Counts I and III of the Third Amended Complaint.

### F.    *Defendants' Motion In Limine*

Defendants move to prevent Plaintiff from introducing at trial any evidence of actual damages that she allegedly suffered as a result of their use of her photographs. They claim she has failed to provide evidence of a causal connection between the alleged infringement and any lost profits she experienced.  Similarly, Defendants move to exclude any evidence of their profits because Plaintiff failed to demonstrate a causal connection between the infringement and their revenue.

We have already determined, after viewing the evidence through the appropriate summary judgment prism, that Plaintiff has proffered evidence of lost modeling fees and lost licensing fees as a result of Defendants' conduct.  We have also found evidence that some portion of Defendants' profits was causally connected to their use of Plaintiff's photographs.   Accordingly, we recommend that Defendants' motion to exclude this evidence be denied.   However, to the extent that Plaintiff seeks to introduce evidence that was not disclosed to Defendants prior to the close of the discovery period, that evidence should be excluded as untimely.  That determination can be made at trial.

Defendants seek to prevent Plaintiff from discussing punitive damages.  We have already found that a jury question exists as to whether Defendants acted with a wanton and conscious disregard of Plaintiff's rights.  The motion *in limine* should be denied as to this point.

Defendants also seek to bar any evidence of damages pertinent to Plaintiff's copyright claims that predates September 29, 2006.  They argue that § 507(b) precludes recovery of damages as to any infringement that predates the date of filing

of this lawsuit by three years, citing *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1320 n. 39 (11th Cir. 2008) ("The statute of limitations, 17 U.S.C. § 507(b), serves only to limit the period of recovery to three years. *See Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992) ("Each act of infringement is a distinct harm giving rise to an independent claim for relief.").").

Similarly, Defendants seek to bar any evidence of damages pertinent to Plaintiff's unauthorized publication of likeness claims that predates September 29, 2005. Section 540.08 does not have its own limitations period so Defendants look to the four-year statute of limitations provision of Fla. Stat. § 95.11(3), which acts as a limitations period for any action not specifically provided for in the operative statute. They claim that the publication of Plaintiff's photographs occurred on only one occasion, thus damages should be calculated from four years prior to the date of the filing of this action.

We recommend that Defendants' motion *in limine* on these latter two points be denied. This case is rife with disputed issues of fact, including when Plaintiff knew or should have known that Defendants were using her photographs, when and how the photographs were added to Defendants' websites, and what damages she suffered or what profits Defendants made, as a result of the use of Plaintiff's photographs. We will not now pre-determine how evidence of Plaintiff's damages beginning in 2003 might relate to these or other issues.

### III.   CONCLUSION

Accordingly, it is hereby **RECOMMENDED** that

1)      Defendants' Motion for Partial Summary Judgment as to (1) Copyright

Infringement Damages, (2) Punitive Damages, (3) Statutory Damages, and (4) Attorney's Fees and Statutory Presumption of Copyright Validity [D.E. 136] be **GRANTED** as follows:

> a.      Plaintiff is precluded from seeking statutory damages or attorneys' fees on the copyright claims (Counts I and III); and

> b.      Plaintiff is not entitled to a presumption of validity on the copyright registrations for the photographs at issue here.

In all other respects Defendants' motion should be **DENIED**; and

> 2)      Defendants' Motion *In Limine* [D.E. 146] be **DENIED**.

   **DONE AND SUBMITTED** in Chambers at Miami, Florida this 7th day of September, 2010.

                                              /s/   *Edwin G. Torres*
                                              EDWIN G. TORRES
                                              United States Magistrate Judge